**In Re the Matter of DIVISION OF FAMILY SERVICES,**

v.

**J.V.J. \*,**

v.

**A.M.,**

v.

**B.T., A.T., her husband Y.G.**

Nos. CS01–03949, 01–11410, CS 01–03948, 01–11417, CS 01–03744, 02–07888, CS02–003428, 02–07911, CS02–03742, 02–15192, CS02–03746 and 02–15241.

Family Court of Delaware, Sussex County.

Submitted: Dec. 13, 2002.
Decided: Jan. 8, 2003.

* Pseudonyms have been assigned to the parties to protect their identities.

James S. Reichert, Department of Justice, Georgetown, for Division of Family Services.

Bruce A. Rogers, Bruce A. Rogers, P.A., Georgetown, for mother.

Margaret R. Cooper, Hudson, Jones, Jaywork & Fisher, Georgetown, for father.

Kristin S. Gibbons, Georgetown, for Court Appointed Special Advocate.

HENRIKSEN, J.

For the reasons hereafter stated, the Court holds that the "Guardian of the Child" provisions under Sections 2330 through 2340 of Title 13 of the Delaware Code, enacted July 11, 2001 and modified July 9, 2002, comply with the "Legal Guardianship" requirements of the Federal Adoption and Safe Families Act of 1997 (ASFA). As such, a guardianship established under these provisions may be an acceptable alternative to provide permanency for a dependent/neglected child. Furthermore, the Division of Family Services is not required to document compelling reasons for proposing such an alternative. The Court believes that this is a case of first (1st) impression for the State of Delaware.

## FACTS

A. W. M. (hereinafter "father") is the natural father of the minor child, J. G., a female child born February 1, 1993. J. V. J. (hereinafter "mother") is the natural mother of the minor children, J. G., and K. G., a female child born August 23, 1996. The natural father of K. G. is unknown. These children were declared dependent and entered foster care on April 15, 2001 due to mother's homelessness, and, in the case of J., also due to father's incarceration. The Division of Family Services (DFS) offered reunification services to mother. Reunification services were not offered to father due to his incarceration and uncertain release date. The children were sent to mother's home for a trial home placement beginning January 7, 2002. Unfortunately, due to various concerns DFS had concerning mother's inability to provide adequate care for the children, DFS took the children back from mother on February 13, 2002. At that time, both children were placed in the home of B. and A. T. The T. filed a Petition for Guardianship requesting that they be granted guardianship of both children. The T. are not related to either of the children. Y. G., father's aunt, also filed a Petition for Guardianship, requesting guardianship of both children.

The Court scheduled a permanency hearing on June 21, 2002. With the exception of the Court Appointed Special Advocate (CASA), all parties agreed that permanency for both of these children would be accomplished by granting guardianship of the two (2) children to A. and B. T. under the "Guardian of the Child" provisions of Title 13, §§ 2330–2340 of the Delaware Code. The CASA opposed, arguing that a guardianship other than a Permanent Guardianship pursuant to the provisions of Title 13, §§ 2350–2359 (hereinafter "Permanent Guardianship") was not a "legal guardianship" as described under ASFA, and thus did not provide adequate permanency for the children. The CASA further argued that DFS had failed to document compelling reasons as to why DFS did not file for termination of parental rights.

At the permanency hearing on June 21, 2002, the Court awarded interim guardianship of both children to the T., while counsel briefed the pertinent issues. The Order of June 21, 2002 also reflected that all parties, including the CASA, agreed that the T. were an appropriate and safe placement alternative for the children. Although agreeing to support the guardianship of B. T., both parents noted that they would oppose any attempt to terminate their parental rights. Y. G., father's aunt, also consented to guardianship of the children being awarded to the T. Ms. G. also requested that her petition be held in abeyance in the event the Court did accept entry of a Final Order of Guardianship to the T.

### *LAW AND REASONING*

■ The Court will first address the less complex of the two (2) issues, that being whether DFS must document compelling reasons when they proposed a permanency plan other than either reunification with a parent or termination of parental rights leading to adoption. The answer to this specific issue lies in a reading of 42 U.S.C. § 675(5)(C) of ASFA, which reads as follows:

> With respect to each such child, procedural safeguards will be applied, among other things to assure each child in foster care under the supervision of the State of a permanency hearing to be held…no later than 12 months after the date the child is considered to have entered foster care…which hearing shall determine the permanency plan for the child that includes whether, and if applicable when, the child will be returned to the parent, placed for adoption and the State will file a petition for termination of parental rights, or referred for legal guardianship, or (in cases where the State agency has documented to the State court a compelling reason for determining that it would not be in the best interests of the child to return home, be referred for termination of parental rights, or be placed for adoption, with a fit and willing relative, or with a legal guardian) placed in another planned permanent living arrangement…

The above wording clearly indicates that DFS would need to demonstrate compelling reasons only if they proposed another permanent placement living arrangement as a means of permanency besides certain enumerated options. Legal guardianship is a permanency status that does not require a showing of compelling reasons.

■ We now address the more difficult issue of determining whether Delaware's "Guardianship of the Child" statute as defined in Title 13, Sections 2330 to 2340, constitutes an acceptable permanency op-

tion under ASFA. In order to do so, this Court must agree that the provisions under Title 13, Sections 2330 to 2340 constitute a "legal guardianship" as defined under ASFA. "Legal guardianship" under ASFA is defined in 42 U.S.C. § 675(7) as follows:

> The term "legal guardianship" means a judicially created relationship between child and caretaker which is intended to be permanent and self-sustaining, as evidenced by the transfer to the caretaker of the following parental rights with respect to the child: education, care and control of the person, custody of the person, and decision-making. The term "legal guardian" means the caretaker in such a relationship.

Delaware's guardianship/permanent guardianship statute was signed into law on July 11, 2001. Certain technical modifications were added on July 9, 2002, which mainly allowed certain special agencies, including DFS, to be included among the persons or entities who had standing to petition the Family Court for a guardianship.

The first (1st) several sections of the Delaware law, Title 13, Sections 2301 through 2328, includes mainly definitions and jurisdictional requirements. The law then goes on to describe two (2) types of guardianships, which are similar in many respects, but also have certain very specific differences. The first (1st) type of guardianship is entitled "Guardian of the Child" and is described in Sections 2330 through 2340. The second (2nd) type of guardianship is entitled "Permanent Guardianships for Children" and is described in Sections 2350 through 2359. Although the first (1st) type of guardianship,

"Guardian of the Child", makes no specific reference to ASFA, the "Permanent Guardianship" section makes specific reference to modeling the "Permanent Guardianship" provisions to the "legal guardianship" definition under ASFA.[1]

Any person, and, as of the amendments dated July 9, 2002, DFS may petition to be the guardian of a child under the "Guardian of the Child" provisions of Sections 2330 through 2340. To be a permanent guardian under Sections 2350 through 2359, however, only a blood relative or a foster parent is eligible to serve as a permanent guardian.[2] A foster parent is defined as *"An individual or couple who has been approved by the Department or a licensed agency to provide foster care in exchange for foster care payments provided by the Department or a licensed agency."*[3] The ability of a foster parent to act as a permanent guardian is further limited in that the child must be at least twelve (12) years of age, or the proposed permanent guardian is already the permanent guardian of one (1) of the child's siblings, or the child receives substantial governmental benefits for a serious physical and/or mental disability which would no longer be available to the child if parental rights were terminated and/or the child was adopted.[4]

In this particular action, the petitioners, the T., are not related to either of the children. At the time of their petition, the T. did not fall within the definition of a foster parent, that being approved by the Department or licensed agency. Even if the T. were approved as foster parents, both children are less than twelve (12) years of age, K. being six (6), and J. being nine (9). Therefore, the T. cannot qualify

---

**1.** Tit. 13, § 2350.

**2.** Tit. 13, § 2351.

**3.** Tit. 13, § 2302(10).

**4.** Tit. 13, § 2353(a)(6).

as permanent guardians under Sections 2350 through 2359. However, these limitations do not eliminate them from qualifying to be guardians of the children under Sections 2330 through 2340.

The permanent guardianship is more difficult to obtain than the guardianship of the child. The permanent guardianship, once ordered, is also more difficult to set aside. Thus, the grounds for establishing a guardianship of a child, unless the parents consent, requires a showing by clear and convincing evidence that the child is dependent and/or neglected, and that it is in the best interests of the child for the guardianship to be granted.[5] The stricter grounds to establish a permanent guardianship require that the Court find by clear and convincing evidence that one (1) of the statutory grounds for termination of parental rights has been established, that adoption is not possible or appropriate, and that the permanent guardianship is in the best interests of the child.

A parent may apply to the Court to modify a Court Order of Guardian of the Child where the parent can prove that the child would no longer be dependent or neglected if placed in the parent's care, and that it was in the best interests of the child to be placed back in the parent's care.[6] Where the Court has granted a Permanent Guardianship, however, a parent may not petition the Court to modify or terminate the permanent guardianship.[7] This is not to say that the Court may not modify or terminate a prior Permanent Guardianship Order. However, the Court will only modify a Permanent Guardianship Order where there is a showing of a substantial change in material circumstances, and the modification or termination is in the best interests of the child.[8] Furthermore, the permanent guardianship statute goes on to note that *"Where a permanent guardianship is terminated by the Court, custody of the child shall not automatically revert to the parent. At any subsequent hearing, the parents shall be considered with no greater priority than any other person or agency . . ."*[9]

Obviously, a Permanent Guardianship Order has certain things in common with a Termination of Parental Rights Order, but is not as final. A Permanent Guardianship Order also has certain things in common with a Guardianship of the Child Order which has the potential of being less permanent than the Permanent Guardianship Order. Whereas parental rights are terminated in a Termination of Parental Rights Order, parental rights continue in both the Permanent Guardianship Order as well as the Guardianship of a Child Order. Under both forms of guardianship, parents continue to have the primary responsibilities to support the child financially, the parents continue to have rights of inheritance by and from the child, and the parents may have such visitation, contact, and information, to the extent delineated in the Order of the Court.[10] The powers and duties of a guardian of a child are set forth in Title 13, Section 2340. Section 2357 specifically states the powers and duties of the permanent guardian are the same as the powers and duties of the guardian of the child. In fact, Section 2357 specifically cites to Section 2340.

**5.** Tit. 13, § 2330(a).

**6.** Tit. 13, § 2332(b).

**7.** Tit. 13, § 2359(a).

**8.** Tit. 13, § 2359(b).

**9.** Tit. 13, § 2359(c).

**10.** Tit. 13, § 2331 and 2358.

As noted previously, ASFA defines "legal guardianship" as: "*. . . a judicially created relationship between child and caretaker which is intended to be permanent and self-sustaining, as evidenced by the transfer to the caretaker of the following parental rights with respect to the child: education, care and control of the person, custody of the person, and decision-making. The term 'legal guardian' means the caretaker in such a relationship.*" [11] When reviewing this Federal definition, it is clear that both of the types of Delaware guardianships described in this decision, the guardian of a child, and the permanent guardian, are judicially-created. The powers and duties granted by the Delaware statutes to both the guardian of a child, and the permanent guardian, set forth exactly those rights which evidence an intent that, as the Federal statute states, "*. . . to be permanent and self-sustaining.*" A Delaware guardian of a child, and a Delaware permanent guardian, both have custody of the child, may establish the child's place of abode within or without the State, and are required to provide the child with a physically and emotionally healthy and safe living environment, daily care, education, medical treatment, decisions regarding travel, the right to marry or enlist in the Armed Services, legal decisions, and any other matter that involves a child's welfare and upbringing.[12] Thus, it is clear that both of these Delaware guardianship statutes, guardianship of the child and the permanent guardianship, fall within ASFA's definition of a legal guardianship. Not only in each case must the relationship be judicially-created; also, in each case, the legal relationship, once created, can only be modified or terminated by Court Order, at which time, except in situations of death, or the child attaining majority, will again require a Court review directed at serving the overall best interests of the child.

The Court acknowledges that certain legal guardianships may have different levels of permanency and self-sustainment. The Federal statute, however, as noted above, sets forth specific criteria which self-defines the intent of being a permanent and self-sustaining Order. Both of the Delaware guardianship statutes discussed in this decision meet that requirement. Although the guarantee of permanency for the child becomes less each time as we step from termination of parental rights, to permanent guardianship, to guardianship of a child, we must recognize in certain situations, as in this case, that where adoption may not be possible, or appropriate, and where the statutory definition makes it impossible for the willing caregiver to become a permanent guardian, the guardianship of the child statute provides an arrangement that is permanent and self-sustaining where these children are placed with caregivers with whom all evidence indicates the children are extremely bonded and will continue to have the possibility of a meaningful relationship with their parents, as well. In the overall view of what is in the best interests of these children, DFS has made a wise decision in pursuing permanency for these children under the guardian of the child statute where it could be more harmful to pursue the termination of parental rights of the parents and a possible adoption with other caregivers who these nine (9) and six (6) year old children may not even know.

It is also important to note that nothing in the above-quoted Federal language defining "legal guardianship" requires that a parent be barred from challenging the legal Guardianship Order in the future. In fact, Jennifer Renne, J.D. of the ABA Center on Children and the Law has specifical-

**11.** 42 U.S.C. § 675(7).

**12.** Tit. 13, § 2340(c)(2)(3) and § 2357.

ly noted that the ability of a parent to challenge a guardianship does not invalidate the permanency of the plan under ASFA.[13] As Ms. Renne states in her article,

> A legal guardianship order remains effective until a court terminates it, or until the child is either adopted, turns 18, or is married. As discussed earlier, legal guardianship is more permanent than foster care, but less legally secure than adoption. Based on a change in circumstances, the legal guardian, the child, *or the parent* can ask the court to terminate the legal guardianship. In some states, any interested party may petition the court to have the guardian removed. Usually this requires a showing of good cause. For example, a guardian may be experiencing health problems that make ongoing care of the child difficult. *Or, the biological parents may have successfully completed drug treatment or jail sentence and is now able to provide a safe home for the child.* The court will hear evidence, and decide whether continuing legal guardianship is in the child's best interest.[14] (Emphasis added).

## BEST INTEREST AND UNDERSTANDING

■ Having determined that the guardianship of a child statute under Title 13, Sections 2330 through 2340 is a feasible alternative to be considered for permanency in certain situations, the Court must now look specifically as to whether or not this is the appropriate permanency plan for the two (2) children involved in this action. To that effect, the Court held a hearing on December 13, 2002. In preparation for that hearing, the Court sent out to the parties a letter setting forth ten (10) specific questions the Court wanted answered at the December 13th hearing. Attending the hearing were mother, and her appointed counsel; father, and his appointed counsel; the CASA, along with its counsel; Ms. T., the non-relative seeking guardianship; Y. G., father's aunt who was also seeking guardianship; and the Division of Family Services.

At the outset of the hearing, mother and father both reaffirmed their desire that the Court award guardianship of the children to B. and A. T., non-relatives. They also confirmed their position that their stipulation as to the dependency of the children at this time is conditioned upon the entry of such an Order, and that neither of them would stipulate to a termination of their parental rights.

Y. G. reaffirmed her consent to the granting of the guardianship petition of the J., but noted that she would choose to pursue her own petition in the event the J. petition were denied. It should be noted that Ms. G., as Mr. M. aunt, is a blood relative of J. As a blood relative, Ms. G. would be eligible to serve as a permanent guardian for J., but not for K. Unfortunately, although the permanent guardian statute has a provision for a State-approved foster parent to become the permanent guardian of a sibling of a child who is under twelve (12), the Court finds no such provision for Ms. G., a blood relative, to be a permanent guardian for K. due to K.'s sibling relationship to J. Thus, any award of guardianship of K. to Ms. G. would also of necessity be pursuant to the guardianship of a child sections 2330 through 2340.

13. *ABA Child Law Practice* Vol. 20, No. 9, "Reasonable Efforts to Finalize a Permanency Plan for Legal Guardianship" (Nov. 2001).

14. Id, at 130.

The Court set forth the following questions to the litigants, and received the following answers:

1. **Why has the Division opted for legal guardianship rather than one (1) reunification or two (2) adoption?**

The Division responded to this question by noting that reunification with J.'s father was not possible because of his incarceration. K.'s father is unknown. The Division attempted reunification with mother, but it failed. Furthermore, the Division had believed that further reunification attempts for mother at this time would be unsuccessful. Mother's failures, as alleged by the Department, were her inability to provide parenting skills for the children, including not getting the children to school regularly and on time, poor hygiene for the children, and the inability of mother to maintain a clean home and provide proper food.

As to the question of adoption, the answers boiled down to the reality that these children are extremely bonded to the T., who have lived nearby and known the children all of their lives, and who also have close ties to the childrens' mother. In fact, mother sees the T. as her own motherly image, and the children and mother are all very attached to the T. Although the T. are not opposed to adopting the children, they see that as a last resort. The T. are very concerned about terminating mother's parental rights in the children where they hope that mother will someday in the future be able to provide adequate care for her children.

2. **Has the Division fully explained to the T. the differences between, and the legal ramifications of, an adoption and a legal guardianship, and do the T. understand those distinctions?**

It was clear that the T., and perhaps even the Division, did not fully understand the complexities of all of the legal differences between guardianship and adoption, such as rights of inheritance and parental liability for damages caused by a child. However, the T. had been explained, and did understand, the most significant difference, that being in an adoption, the parents would give up their parental rights; whereas in a guardianship, mother and father could seek to rescind the Guardianship Order and resume the responsibility for caring for the children, assuming that the parents, or either of them, could satisfy the Court that they had overcome the problems that caused their dependency and/or neglect, and such a return to them was found to be in the childrens' best interest.

3. **If financial assistance is a concern and/or necessity to the T., has the Division fully explained what potential financial assistance is available to the T. in an adoption as opposed to a legal guardianship, and do the T. understand what is available in each scenario?**

The Division had explained, and the T. understood, that whether they were guardians of the children, or adopted the children, they would receive the same amount of financial assistance from the State, that being $914 per month, with periodic increases, and Medicaid until the children turn eighteen (18). The T. also learned in Court that if they adopted the children, the parents would no longer owe a duty of

support. Under a guardianship award, the parents would still owe an obligation of child support, which would most likely be pursued against the parents by the State in the T.' behalf.

**4. If the T. were appointed guardians, what is their understanding as to how they would involve, or not involve, the parents of the children.**

Mother is twenty-nine (29) years of age. Father is about to be resentenced to an unknown period of incarceration for the crime of Assault in the First Degree, which will certainly involve a certain number of years.[15] The T. clearly desire that the childrens' mother be involved on a considerable basis with them. Presently, the childrens' mother sees the children at Ms. T.'s sister's home, approximately five (5) to six (6) times a month. The T. also have no problem with allowing the father to have contact with J. by telephone, and also plan to take J. to visit her father at the prison.

**5. If the T. were appointed guardians, would they have the means, both mentally and financially, to care for the children.**

None of the parties in the court room disputed the T.' ability to provide proper mental and financial care for these children. Ms. T. noted that if she did not receive the assistance, she would still take care of the children. However, she noted that the financial assistance from the State would help considerably. Ms. T. is a self-employed landscaper. Ms. T is fifty-five (55) years of age and Mr. T. is sixty-two (62) years of age. Both are in good health.

**6. What is the commitment of the T. to providing a permanent and stable environment for each of the children, and what is the quality of that present relationship?**

The T. hope that mother will get her act together in the future, and may be able to get her children back. The T. would like to adopt the children, but want to give mother the hope and opportunity to become a mother to her children which would not exist, in the T.' minds, if they were to adopt at this time. Ms. T. was clear, however, that she would be there for these children forever, just as if they were one of her own four (4) children. Incidentally, the T. have raised four (4) children, who are all grown, employed, and who did not have problems with the law.

The DFS worker and the CASA both indicated that the children have an excellent relationship with the T., and in fact really love the T. The CASA told the Court that there is lots of love demonstrated in the interaction between the T. and the children, and the children are always well-dressed and very happy.

**7. Is the Division and others convinced that the T. are the best caregivers for the children, or are there other possible alternatives that should be reviewed.**

Earlier responses have already covered the general answer to this question. In addition, Ms. T. told the Court that she and her husband see that the children get to school, see doctors when they need medical attention, and also go to the dentist.

---

**15.** Father's assault was of a non-relative and does not raise any of the presumptions of the Child Protection From Domestic Violence Act found in Tit. 13, § 701A, *et. seq.*

The Division confirmed for the Court, as did the CASA, that it is their feeling that the best caregivers for these children are the T. Although Ms. G. would also be an appropriate caregiver, the children are very close to the T. and much more strongly bonded to them.

8. **Do the children have any special or unique needs, and, if so, will the T. be able to deal with these needs, and is there available funding to do so.**

The only special concern for these children, as voiced by the CASA, was that the older child, J., who is now in third (3rd) grade, reads at a first (1st) grade level. Ms. T. is aware of this problem, and both she and the CASA agreed that help is being sought for J. within the school system. No one doubted the ability of the T. to deal with any unique or special needs that might arise with these children.

9. **The Court will want to have the T. explain why they are seeking legal guardianship rather than adoption. If the agency denied the T.' request for an adoption, the Court will want to learn about the agency's concerns. If the T. are unwilling to adopt, the Court will want to know why, and what attempts the agency addressed to the T. about their concerns about adoption.**

The Division worker confirmed that the T. were never denied for adoption; in fact, the Division would favor an adoption by the T. However, as previously stated, the T. are not willing to adopt at this time, but would do so if it was necessary to keep the children with them. The T. prefer to give mother the opportunity to become a good mother in the future, and are at this time opposed to a situation which would require mother to terminate her parental rights.

10. **If the Court should grant guardianship of the children to the T., will the Division still be involved in assisting the T., and if so, how. Furthermore, do the T. understand the agency's future involvement or lack of it.**

The T. were aware that the financial assistance that they presently receive for the children will continue to them after they are made guardians.[16] They are also aware that once they become guardians, the Division would not be actively involved with them, and would close their case. However, the T. were made aware by the Division that if a special problem occurred, they could call the Division of Family Services for assistance. Furthermore, since the T. have now qualified as foster parents, they will receive visits approximately every three (3) months from the State agency monitoring foster parents.

### CONCLUSION AND ORDER

In conclusion, ASFA rules do not require DFS to document "compelling reasons" where they propose permanency for a child through a legal guardianship as defined by ASFA.

Also, the Delaware guardianship of a child statute set forth in Title 13, Sections 2330 through 2340 qualifies as an ASFA

---

16. Although, apparently for budgetary reasons, the Delaware Department of Childrens' Services at this time is unable to offer monetary assistance to the guardians, the T. were offered such assistance previously under Tit. 13, § 2333, and their assistance will continue.

legal guardianship. Therefore, use of Delaware's "Guardian of a Child" provisions may be considered an acceptable permanency option under ASFA.

Finally, the Court finds that awarding guardianship of the two (2) children to A. and B. T. pursuant to Delaware's guardian of the child statute found in the provisions of Title 13, Sections 2330 through 2340 is an appropriate permanency plan for the two (2) children in this matter, and is in the best interests of these two (2) children. Furthermore, visitation of the two (2) children with their mother, J. J., is appropriate and in the best interests of the children so long as the visitation meets with the approval of the guardians. The guardians shall also be responsible to see that A. M., father of J. G., has visitation with his child, including the ability to have regular telephone and letter contact, with actual visits occurring not less than one (1) time per month.

**IT IS SO ORDERED.**